# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, ) ) ) Plaintiff, ) ) v. ) ) APPALACHIAN POWER CO., ) ) Defendant. ) | Case No. 1:18CV00035 **OPINION AND ORDER** By: James P. Jones United States District Judge |

*Deborah A. Kane, U.S. Equal Employment Opportunity Commission, Pittsburgh, Pennsylvania, and Debra M. Lawrence and Ronald L. Phillips, U.S. Equal Employment Opportunity Commission, Baltimore, Maryland, for Plaintiff; Thomas M. Winn, III, and Patice L. Holland, Woods Rogers PLC, Roanoke, Virginia, for Defendant.*

In this Title VII sexual harassment and retaliation case brought by the Equal Employment Opportunity Commission ("EEOC"), I will grant in part and deny in part the defendant's Motion for Summary Judgment.

I.

The following facts are taken from the summary judgment record and are stated in the light most favorable to the plaintiff.

Lea Kade was a temporary administrative worker at Appalachian Power Company's ("APCO") Clinch River plant. She initially learned of the position through her stepfather, who worked at the plant, but she was paid through a

staffing agency (first Day and Zimmerman, Inc., and later Kelly Services). She began working at the plant in November 2016.

Kade's supervisor at APCO was James Brinkman. Kade testified that Brinkman began to sexually harass her in April 2017. Before then, Kade thought Brinkman was strange and had anger issues, and he gave her gifts, but he did not do anything that she construed as sexual harassment. Some of the gifts he gave her were significant, including monetary gifts of $1,500 and $500. He suggested, and she believed, that he was simply trying to help her because she was struggling financially. He also gave her and another temporary employee restaurant gift cards.

In April 2017, Brinkman asked Kade to work overtime on a Saturday to help him paint an office. When they finished painting, he followed her to her desk and told her that he had a crush on her. He told her that she was beautiful and had a great personality, that he had feelings for her, and that he loved her. She responded by telling him that she was there to work and provide for her children.

Kade testified that over the coming months, Brinkman continued to make inappropriate comments to her such as that he caught himself "all the time looking at [her] ass," she was beautiful, he loved her, she was his sunshine, and he wanted to leave his wife to be with her. Pl.'s Br. Opp'n Ex. A, Kade Dep. 15, ECF No. 44-3. In a declaration filed in opposition to the Motion for Summary Judgment,

Kade stated that he made such comments several times a week, and she always responded that she was there to work and provide for her children.

Kade testified that Brinkman would become jealous or angry when she was around other men or when she did not respond positively to his comments. He would sometimes slam doors or slam books and papers onto desks. Although he apparently did these things throughout her employment at the plant, she did not begin to connect his displays of anger with sexual harassment until after he revealed his feelings for her in April 2017. After one such angry outburst, he sent a box of chocolate-covered strawberries to her house with a note indicating that they were meant as an apology. In her declaration, Kade stated that Brinkman yelled at her nearly weekly and that she found his displays of anger threatening.

Kade also testified that Brinkman would follow her around the plant and join her uninvited for smoke breaks. She expressed her annoyance with this to other employees, but several coworkers testified that they thought Kade and Brinkman were friends because they spent a great deal of time together and seemed to enjoy each other's company.

Kade testified that she told coworker Carol Vicars about Brinkman's comments, but Vicars discouraged her from complaining unless Brinkman was touching her because a former employee had complained about harassment in the past and had been fired. Kade also told Chris Cline, the maintenance supervisor,

about Brinkman's comments.  Cline witnessed Brinkman slamming doors, but he simply shook his head and took no action.  Kade relayed to Robert Frazier a comment that Brinkman had made about leaving his wife.  Frazier offered to do something about the situation, but Kade told him not to do anything and that Brinkman was just being socially awkward.  Vicars testified that Kade would vent to her about Brinkman but never seemed to feel belittled or harassed by him.

Kade testified that Brinkman told her that he knew she could get him into a lot of trouble, but she would not because he would "pull rank and terminate [her]." *Id.* at 22.  She says she did not complain to management because she was fearful of his threat.  She was a single mother of two teenage daughters and needed the money she was earning from her work at the plant.

Brinkman terminated Kade on October 17, 2017, a Tuesday.  Kade testified that over the preceding weekend, Brinkman had sent her a text message saying that he wanted to take her out and treat her like a queen.  She did not respond.  She had told him that she would be taking her daughters to the dentist that Monday and, depending on how long the appointment lasted, she might not make it to work.  Kade lived an hour and a half from the plant, and her workday typically ended at 3:30 PM.

Brinkman testified that he sent Kade a text message on Monday asking how things were going, referring to the dentist appointment, in order to determine

whether she would be coming to work. She did not respond to his text message. Brinkman was not at the plant on Monday either, but he testified that on the preceding Friday, he had left her some work to complete on Monday.

According to Kade, when she arrived at the plant on Tuesday,[1] Brinkman was in a bad mood. Kade testified that he was upset that she had not responded to his recent text message in which he said he wanted to come to her home, take her out, and treat her like a queen. Brinkman testified that he confronted her about not responding to his text message regarding whether she would be coming to work on Monday. In her declaration, Kade stated that she walked away from him and he followed her down the hallway, saying, "mmm, mmm, mmm," which she took to be expressing sexual interest in her body.[2] She turned around, pointed her finger in his face, and said, "I'm not putting up with your shit today." *Id.* at 21. Brinkman responded by telling Kade she was terminated.

---

[1] In her deposition, Kade said this interaction took place on Monday. Defense counsel places great emphasis on this discrepancy, insisting that Kade is conflating the events surrounding her termination with events that occurred at an earlier, unspecified time. I conclude, however, that a jury could find that Kade simply misspoke in her deposition when she said that her termination occurred on Monday rather than Tuesday.

[2] APCO notes that this alleged "mmm, mmm, mmm" comment does not appear anywhere else in the record aside from Kade's declaration. She apparently did not mention it during the internal investigation, the EEOC investigation, or her deposition. The EEOC responds that Kade simply was not asked in her deposition about every statement Brinkman made on the morning of her termination, and the investigation documents are not intended to note every detail.

Brinkman contends he terminated her because of her no-call, no-show the day before, along with prior attendance issues. He sent his supervisor, Lyle Hartsock, an email at 6:59 AM on October 17, 2017, in which he wrote, "FYI, I just terminated Lea this morning. She once again didn't show up yesterday and did not let me know. She displayed a little bit of an attitude when asked about it and since it wasn't the first time, I decided I'd had enough." Def.'s Mem. Supp. Ex. 8, Brinkman Dep. 36, ECF No. 35-8.

Kade gathered her things and left, crying. She ran into Frazier in the parking lot, where she told him Brinkman had fired her for not responding to his text. She testified that she had been referring to the text in which Brinkman told her he wanted to take her out, but she did not explain this to Frazier. She also sent a text message to Vicars stating that Brinkman had fired her for not responding to his text, but she did not explain further to Vicars either.

Brinkman called Kade the next day, asking her to talk to him and let him make things right. She hung up, but he called back and again asked if they could work things out. Kade told Brinkman he had fired her for not submitting to his advances, and she hung up again. He called a third time and she did not answer.

According to Kade, Brinkman did not tell her he was firing her for attendance issues, and he did not document any attendance problems. He did not

discuss her attendance with Hartsock before he terminated her. He did not communicate any attendance issues to the staffing agency.

Kade sought a corporate phone number and complained about Brinkman's behavior almost immediately after he fired her. APCO's Ethics and Compliance department conducted an internal investigation and concluded that Brinkman had behaved inappropriately, but that his misconduct did not amount to sexual harassment. The investigation revealed that Kade had submitted and Brinkman had approved time sheets that included hours she had not actually worked. APCO deemed this time card fraud, and it terminated Brinkman as a result. It further decided not to reinstate Kade because she had also committed time card fraud.

APCO had charged Brinkman, as Kade's supervisor, with training Kade on the company's anti-harassment policy. Kade testified that he never provided her with a copy of the policy or any training, nor did anyone else. However, she signed an attendance sheet dated February 14, 2017, for a training session on the Code of Conduct, which included the anti-harassment policy. She claims she was not given a company handbook or a copy of the Code of Conduct. She contends she did not see any postings on bulletin boards relating to the anti-harassment policy, although APCO has offered evidence that the policy was posted in the hallway outside her work station and she would have walked by it several times a

day. In response to discovery requests, APCO did not produce any materials it used in anti-harassment training sessions.

The EEOC contends that even if Kade was aware of APCO's anti-harassment policy, the policy is too vague to be effectual. It does not specifically mention sexual harassment and does not state what kind of behavior is prohibited. It does not require supervisors or management personnel to elevate complaints of harassment.

Kade maintains that she did not complain about sexual harassment not because she was unaware of the policy or did not know how to complain, but rather because she feared losing her job. There is no indication that Kade ever mentioned the alleged sexual harassment or otherwise complained about Brinkman's behavior to her stepfather. Kade declared that she did not welcome Brinkman's attention. He was married and she had no interest in him. She felt his behavior was humiliating and his comments degrading. She was worried he was staring at her every time she got up from her desk. She had difficulty sleeping. She endured his treatment because she desperately needed the job, which paid her $17.50 per hour.

Brinkman admitted telling Kade he thought she was attractive, but he said it was in response to her self-deprecating comments. He testified that she once asked him if she had something on her pants and he said no and then made a joke about

people seeing him staring at her behind. He admitted sending her chocolate-covered strawberries as an apology for losing his temper. He admitted giving her money. Brinkman and Kade both admitted that he padded her time so that she would receive pay for hours she had not worked. Kade admits that Brinkman never touched her, and the record contains no indication that he ever propositioned her for any sexual activity. Kade admitted that she and Brinkman rarely exchanged text messages with one another aside from work-related messages.

II.

The EEOC asserts that APCO "subjected Ms. Kade to an unlawful sexually hostile work environment perpetuated by Defendant's Administrative Supervisor," Brinkman. Compl. 1, ECF No. 1. The EEOC further contends that "the sexually hostile work environment created by Defendant culminated in Ms. Kade's discharge because of sex (female) and her protected opposition to Brinkman's unlawfully sexually harassing conduct." *Id*. While the Complaint does not set forth separate causes of action, in their briefs and oral arguments, the parties have construed the Complaint as asserting claims under three separate theories: hostile environment sexual harassment, quid pro quo sexual harassment, and retaliatory discharge.

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate

against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986). Courts typically divide sexual harassment claims into two categories: hostile environment sexual harassment and quid pro quo sexual harassment. *See, e.g., Okoli v. City of Balt.*, 648 F.3d 216, 226 (4th Cir. 2011) (Wynn, J., concurring); *McWilliams v. Fairfax Cty. Bd. of Supervisors*, 72 F.3d 1191, 1195 (4th Cir. 1996).

The Supreme Court has explained that the key distinction between hostile environment and quid pro quo claims is whether the employee suffered some tangible employment action as a result of the harassment. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751 (1998). "Cases based on threats which are carried out are referred to often as *quid pro quo* cases, as distinct from bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment." *Id.*

> When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII. For any sexual harassment preceding the employment decision to be actionable, however, the conduct must be severe or pervasive.

*Id.* at 753-54.

## A. Hostile Environment.

To establish a hostile work environment claim, the plaintiff must show that the alleged conduct "(1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003). As to the first element, employees can demonstrate that conduct is unwelcome by voicing their objection to it to the alleged harasser or to the employer. *Strothers v. City of Laurel,* 895 F.3d 317, 328–29 (4th Cir. 2018). As to the second element, "[a]n employee is harassed or otherwise discriminated against because of his or her sex if, but-for the employee's sex, he or she would not have been the victim of the discrimination." *Wrightson v. Pizza Hut of Am., Inc.*, 99 F.3d 138, 142 (4th Cir. 1996) (internal quotation marks omitted). "The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (citation omitted).

The fourth element, imputation to the employer, is satisfied where harassment by a supervisor culminates in a tangible employment action such as termination. *See, e.g.*, *Okoli*, 648 F.3d at 222. In such a situation, the affirmative

defense set forth in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Ellerth*, 524 U.S. 742, is unavailable. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) (explaining that where the harasser is a supervisor and "the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable").

The third element of a hostile work environment claim — that the conduct was so severe or pervasive as to create an abusive work environment — is where the parties to this case focus most of their attention. This element has both subjective and objective components. *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009); *see also Perkins v. Int'l Paper Co.*, No. 18-1507, 2019 WL 4018288, at *5 (4th Cir. Aug. 27, 2019). Plaintiffs must show that they did perceive, and a reasonable person would perceive, the environment to be abusive or hostile. *Cent. Wholesalers*, 573 F.3d at 175. This is a "'high bar.'" *Perkins*, 2019 WL 4018288 at *5 (citation omitted).

In conducting the subjective inquiry, courts need only look at the testimony of the complaining witnesses. *EEOC v. R&R Ventures*, 244 F.3d 334, 339 (4th Cir. 2001). "In conducting the objective inquiry, courts should examine all the circumstances, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely offensive; and (4) whether it unreasonably interferes with an employee's work

performance." *Id.* (internal quotation marks and citation omitted). Simple teasing, offhand comments, and isolated incidents, unless extremely serious, do not amount to a sufficiently abusive or hostile environment. *Faragher*, 524 U.S. at 788.

"[H]arassment is considered sufficiently severe or pervasive to alter the terms or conditions of the employment if a workplace is 'permeated with discriminatory intimidation, ridicule, and insult.'" *Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009) (citation omitted). "Not all sexual harassment that is directed at an individual because of his or her sex is actionable. Title VII does not attempt to purge the workplace of vulgarity." *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996) (internal quotation marks and citation omitted).

"The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." *Oncale*, 523 U.S. at 81. The Fourth Circuit has "recognize[d] that the line between a merely unpleasant working environment and a hostile or deeply repugnant one may be difficult to discern." *Hopkins*, 77 F.3d at 753 (internal quotation marks and citation omitted).

As an initial matter, APCO argues that Kade's declaration contradicts her deposition testimony by saying that comments occurred daily and weekly, when in her deposition she was given every opportunity to describe every instance and only discussed a few instances. Therefore, APCO asks me to disregard the declaration. I do not find that the declaration is inconsistent with Kade's deposition testimony, however, and I will consider it. Even so, and drawing all reasonable inferences in Kade's favor, I conclude that Kade has failed to present evidence showing that she was subjected to sexual harassment that objectively was so severe and pervasive as to alter the terms and conditions of her employment.

The totality of the circumstances here does not rise to the level of an objectively hostile working environment. Brinkman never touched Kade, physically threatened her, or sexually propositioned her. He rarely sent her text messages. Coworkers frequently saw the two laughing with one another at the plant and thought they were friends. Aside from a statement about staring at her behind? and an ambiguous "mmm, mmm, mmm" sound, the record contains no evidence that Brinkman made any explicitly sexual statements to or in the presence of Kade. There is no evidence that he exhibited any hostility toward women. While he sometimes displayed anger, Kade did not begin to connect Brinkman's anger with sexual harassment until after he professed his feelings for her. The only corroborating evidence of such a connection is Vicars's testimony that Brinkman

sometimes became "pouty" when other men were around. Pl.'s Mem. Opp'n Ex. C, Vicars Dep. 11, ECF No. 44-5.

The allegations in *Hopkins* were similar to but worse and more frequent than those here, yet they were found not to be sufficiently severe or pervasive. The court of appeals characterized them as "temporally diffuse, ambiguous, and often not directed specifically at" the plaintiff. *Hopkins*, 77 F.3d at 753. In a more recent case, the Eleventh Circuit stated, "Mere solicitude, even if repetitive, is not sexually harassing behavior." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), *overruled on other grounds by Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006). In other words, expressing romantic interest in a coworker or subordinate or asking them out is not enough on its own to establish a Title VII hostile environment claim. The *Gupta* court found that "Gupta cannot establish her hostile environment claim with allegations that Rhodd stared at her twice, touched her ring and bracelet once, and kept asking her to lunch. Assuming it was sexual in nature, none of that conduct was severe, threatening, or humiliating." *Id.* at 585.

The Eighth Circuit has also addressed a somewhat similar set of facts. *Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003). The court made the following assessment:

> Yates strikes us as being a troubled individual, insecure, depressed, and in need of constant reassurance of his worth as a human being.

> His "I love you" comments to Alagna, when considered in the light of his plaintive calls for reaffirmation of self-worth and the absence of any sexual advances on his part, are more indicative of one in search of friendship than of a sexual predator.

*Id.; see also O'Dell v. Trans World Entm't Corp.*, 153 F. Supp. 2d 378, 387 (S.D.N.Y. 2001), *aff'd*, 40 F. App'x 628 (2d Cir. 2002) (unpublished).

These cases demonstrate that a workplace crush and the kind of related behavior at issue in this case simply do not meet the high threshold of objectively severe and pervasive harassment necessary to establish a hostile environment claim under Title VII. Viewing the evidence in the light most favorable to the plaintiff, I conclude that the EEOC's hostile environment sexual harassment claim fails as a matter of law, and I will grant APCO's Motion for Summary Judgment as to that claim.

### *B. Quid Pro Quo.*

As noted above, the EEOC does not have to establish severity or pervasiveness with respect to the quid pro quo claim, as the tangible employment action itself altered the terms and conditions of Kade's employment (in this case, by ending it). A plaintiff must instead establish the following five elements of quid pro quo harassment:

>    1 The employee belongs to a protected group[;]
>
>    2 The employee was subject to unwelcome sexual harassment[;]
>
>    3 The harassment complained of was based upon sex[;]

4 The employee's reaction to the harassment affected *tangible aspects* of the employee's compensation, terms, conditions, or privileges of employment. The acceptance or rejection of the harassment must be an express or implied condition to the receipt of a job benefit or cause of a tangible job detriment to create liability. Further, as in typical disparate treatment cases, the employee must prove that she was deprived of a job benefit which she was otherwise qualified to receive because of the employer's use of a prohibited criterion in making the employment decision[; and]

5 The employer, as defined by Title VII, 42 U.S.C. § 2000e(b), knew or should have known of the harassment and took no effective remedial action.

*Okoli*, 648 F.3d at 222 (citation omitted). The key issue as to the EEOC's quid pro quo claim is the cause of Kade's termination, which goes to the fourth element above. Again, "[t]he fifth element is 'automatically met' when the harassment was alleged to have been perpetrated by a supervisor." *Id.* (citation omitted).

The familiar *McDonnell Douglas* burden-shifting framework applies to quid pro quo claims under Title VII. *Id.* at 222-23; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "If the plaintiff makes a prima facie showing, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action." *Okoli*, 648 F.3d at 222. "Then, if the employer satisfies its burden, the burden returns to the plaintiff to establish that the employer's proffered reason is a pretext for discrimination." *Id.* at 223.

I find that there is a genuine dispute of material fact regarding Brinkman's reason for terminating Kade. Reasonable jurors could find that Brinkman fired

Kade because she rebuffed his advances. Although APCO asserts that Brinkman legitimately terminated Kade because she did not come to work the day before, Kade testified that he knew she may not report to the plant that day. Moreover, Brinkman condoned Kade's prior absences, as evidenced by his approval of her time sheets allowing her to be paid for hours she did not work. He apparently never documented any previous attendance issues. Therefore, a jury could reasonably conclude that Brinkman's stated reason for terminating Kade was pretextual and that he in fact fired her because she did not respond positively to his romantic overtures.

Kade has established a prima facie case of quid pro quo discrimination. It is undisputed that Kade was terminated and thus suffered a tangible employment action. Because the EEOC has established a genuine dispute of material fact as to the reason for her termination, I find that summary judgment is not warranted. I will therefore deny APCO's Motion as to the quid pro quo claim.

### C. Retaliation.

The EEOC's retaliation claim is closely tied to its quid pro quo claim. The anti-retaliation provision of Title VII prohibits employers from "'discriminating against any of their employees because the employees have opposed any practice made an unlawful employment practice by Title VII.'" *Coleman v. Md. Ct. of App.*, 626 F.3d 187, 190 (4th Cir. 2010) (alterations omitted) (quoting 42 U.S.C. §

2000e–3(a)).  The elements of a prima facie retaliation claim under Title VII are: (1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action.  *Id.*

Protected activities include both opposition to an unlawful employment practice and participation in an investigation or proceeding regarding an unlawful employment practice.  42 U.S.C. § 2000e–3(a).  For purposes of Title VII, opposition encompasses an employee's complaints to her employer that she believes the employer has engaged in unlawful discrimination.  *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416–17 (4th Cir. 2015).  Although the Fourth Circuit has not yet ruled on the issue, the Sixth Circuit has held that an employee's direct "demand that a supervisor cease his/her harassing conduct constitutes protected activity covered by Title VII."  *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015).

Once the plaintiff establishes a prima facie case of retaliation, "the burden then shifts to the employer to articulate a nonretaliatory reason for the firing, and the plaintiff then has the burden to demonstrate that the articulated reason is pretextual."  *Dooley v. Capstone Logistics, LLC*, 764 F. App'x 389, 390 (4th Cir. 2019) (unpublished) (citing *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)).

Here, the EEOC has produced evidence sufficient to make out a prima facie case of retaliation, and APCO has offered a legitimate, non-discriminatory reason for Kade's discharge. The EEOC thus bears the burden of proving that the stated reason — the no-call, no-show and related attendance issues — was pretextual. For the reasons stated above as to the quid pro quo claim, I find that the EEOC has proffered sufficient evidence from which a jury could infer pretext. The lack of documentation about attendance issues and the close proximity to Brinkman's alleged advances further suggest that her opposition to his harassment may have been the real reason that Brinkman terminated Kade.

I find that the EEOC has presented sufficient evidence to overcome APCO's Motion for Summary Judgment as to its retaliation claim. Because genuine issues of material fact preclude judgment as a matter of law on that claim, I will deny the Motion.

### III.

For the foregoing reasons, it is **ORDERED** that the defendant's Motion for Summary Judgment, ECF No. 34, is GRANTED IN PART and DENIED IN PART. The Motion is granted as to the hostile environment sexual harassment claim and denied as to the quid pro quo and retaliation claims.

ENTER: September 24, 2019

/s/ *James P. Jones*
United States District Judge